E. L. H. GEIGER, JOHN DOWNEY and JAMES M. EPPLY, Assignees in bankruptcy of JAMES McGUCKIN, GEORGE T. SHOWER and JAMES McGUCKIN, JR., vs. THE WESTERN MARYLAND RAILROAD COMPANY.

*Railroad Companies— Construction of Contract— Liquidated damages— Evidence.*

Under a contract made with a railroad company for the construction of a portion of its road, it was provided, that the work was to be done under the direction of the engineer of the company, who was to make monthly estimates of the quantity, character and value of the work done, and 85 per cent. of the value of the work estimated for, was to be paid to the contractors, the remaining 15 per cent. being retained; and when the work should be completed and accepted by the engineer, a final estimate of all the work was to be made by him, and the balance appearing to be due the contractors, including the per centage so retained, was to be paid to the contractors. The contract further provided that if the contractors should not from time to time comply with the stipulations on their part in manner and form, and within the time stipulated, *or* in case it should appear to the chief engineer that the work did not progress with sufficient speed, *or* in case of interference with the work by legal proceedings instituted against the contractors by any one, other than the company itself, the said chief engineer might annul the contract by notice in writing to the contractors; and that upon the service of such notice, "the aforegoing agreements on the part of the company, and every claim, and part thereof shall become null and void, and the unpaid part of the balance of the work shall be forfeited by the said parties of the first part to the use of said company, in the nature of liquidated damages." The work not having progressed with that speed which the engineer of the company thought it ought to do, and the contractors having failed after due notice to remove monthly the quantity of earth required, the engineer annulled the contract. In an action brought by the assignees in bankruptcy of the contractors against the company, it was HELD:

Geiger, *et al. vs.* The Western Maryland R. R. Co.

1st. That the engineer had the right to annul the contract.

2nd. That the forfeiture of the unpaid value of the work done was to be considered as a fixed sum for compensation, in the nature of liquidated damages.

At the time of the annulment of the contract the company had in hand the 15 per cent retained on the monthly estimates, and in addition thereto was indebted to the contractors a certain amount on account of the monthly estimates. HELD:

That the latter amount was not intended to be included in the forfeiture, but only the 15 per cent. retained under the contract.

After the commencement of the work its progress was delayed by the failure on the part of the company to secure the right of way, and by the inability of the company to pay the monthly estimates according to the terms of the contract. The work was afterwards actively resumed and no claim was then made by the contractors on account of any supposed breaches by the company. HELD:

That there was no ground upon which the plaintiffs could maintain a claim for damages on account of breaches of the contract by the defendant.

The plaintiffs then offered to prove that after the contract had been annulled the new parties to whom the work was allotted, did not proceed with more expedition than the contractors under whom the plaintiffs claimed. HELD:

That the evidence was inadmissible.

The plaintiffs then offered to prove that after the annulment of the contract and after the company had advertised for proposals, the plaintiffs called upon the officers of the company, and offered to do the work at the former prices, and to give security for its faithful execution. HELD:

That this evidence was inadmissible.


APPEAL from the Superior Court of Baltimore City.

A statement of the case will be found in the opinion of the Court. Three exceptions were taken in the Court below by the appellants ; the first and second to the exclusion of evidence, and the third to the rejection of their prayers and the granting of those of the defendant. The prayers are omitted as the Court's judgment thereon is based exclusively upon the views expressed in the opinion. The verdict and judgment being for the defendant, the plaintiffs appealed.

The cause was argued before BARTOL, C. J., STEWART, GRASON, MILLER and ROBINSON, J.

*Stewart Brown* and *F. W. Brune,* for the appellants.

The thing to be done in construing the contract is to ascertain the real meaning and intent of the parties, and in so doing, where technical expressions, such as "liquidated damages," have been used, the Court will not allow itself to be confined to the mere language of the particular provision, however explicit, as standing by itself, even. where a contrary construction is expressly declared not to be intended; but, from the whole instrument, from the nature of the undertaking, the situation of the parties, the effect of the construction upon the rights of the parties, the number, variety and relative importance of the defaults to be compensated for, or punished by one general clause of forfeiture, will determine what must have been the meaning of the parties, notwithstanding in what terms they may have expressed that intention.

Further—In considering a provision like this, in view of the unwillingness of the law to work a forfeiture, in order also to guard against oppression, and looking upon compensation as the true measure of damages, the Courts have laid down certain general principles of interpretation of such contracts, which will be applied wherever applicable.

The rule is well stated in *Mayne on Damages,* 92 *Law Library,* (66) thus: "when the sum which is to be security for the non-performance of an agreement to do several acts, will, in case of breaches, in some instances be too large, and in others too small a compensation for the injury thereby occasioned, that sum is to be considered as a penalty." 3 *Parsons on Contracts,* 159, gives two rules as the result of the authorities, viz : The sum agreed on will be treated as penalty, unless it is payable for an injury of uncertain amount and extent, or, unless payable for *one*

breach of contract, or if for many, unless the damages to arise from *each* of them, are of uncertain amount. See *Astley vs. Weldon*, 2 *B. & P.*, 346; *Kemble vs. Farren*, 6 *Bing.*, 141; *Horner vs. Flintoff*, 9 *Mees. & Welsby*, 678; *Taloe vs. Sandiford*, 7 *Wheat.*, 13; *Beall vs. Hayes*, 5 *Sandf.*, 640; *Owens vs. Hodges*, 1 *McM.*, 106; *Foley vs. McGeegan*, 4 *Iowa*, 1; *Watts vs. Sheppard*, 2 *Ala.*, 425; *Streeper vs. Williams*, 48 *Penna.*, 454; *Hough & Wife vs. Kugler*, 36 *Md.*, 195.

Applying these rules as laid down in said authorities to the particular provisions in question, it will be found that the disputed sum falls within the class of penalties, or securities, and not liquidated damages.

The nature of the right to annul, and the circumstances under which it may be exercised, are yet to be considered. After the time fixed by the contract for completion, or at least after the time (if any,) to which such completion had been definitely postponed, (more particularly if it appeared that the company had prevented or contributed to prevent such completion within the time,) such right could not lawfully be exercised.

There was ample evidence to show not only that the contractors were hampered and delayed in working, but also that these defaults on the part of the Company, prevented the completion, or contributed to prevent the completion within the original time prescribed.

This was matter of fact for the jury, and the evidence should in this view have been submitted to them, but is altogether disregarded by the Court's instructions. *Rodemeyer vs. Hazlehurst*, 9 *Gill*, 288; *B. & O. R. R. Co. vs. Resley*, 7 *Md.*, 297; *Parker Vein Coal Co. vs. O'Hern*, 8 *Md.*, 197.

But if the appellee's view be correct, and the forfeiture be enforced, it can only be applied to the 15 per cent. fund retained under the contract, until its completion. Because—1st. This is the only fund designated, that even

approaches a *liquidated sum.* 2d. It is the only fund that was to remain *unpaid,* or that could come properly within the description of the "*unpaid* part of the value of work done." All other sums, and particularly the 85 per cent. monthly estimates, were expressly stipulated to be paid, and in no proper sense, after they became payable, ought they to have been unpaid. 3d. Especially is this the case, in view of the extent of the right *claimed* in the appellee's prayers, to be exercised on the mere volition of the engineer, subject to no review, requiring no justification by facts, and no proof of default; only such things should pass under forfeiture as are expressly included in its terms. 4th. Nor could damages, caused by the company's defaults, rightfully remain unpaid, at any period, and such, if any, should not be included.

No such distinctions were made however, but every amount retained in hand, due or withheld, was by the Court declared *forfeited. Howard vs. Phila. & B. R. R. Co.,* 13 *Howard,* 307. See also, *Faunce vs. Burke,* 16 *Penna.,* 478; *Streeper vs. Williams,* 48 *Penna.,* 450; *Rodemeyer vs. Hazlehurst,* 9 *Gill,* 288.

*Robert Baldwin* and *William A. Fisher,* for the appellee.

Under the first exception, the appellants proposed to show, that after the contract had been annulled, the parties, to whom the work was allotted on the Baltimore Division, did not proceed with more expedition than McGuckin, Shower & Co. There can be no doubt that the Court acted properly in the rejection of this testimony.

It was offered for the purpose of showing that McGuckin, Shower & Co. were proceeding with reasonable expedition. The question as to whether the work was progressing properly, was not to be passed upon by the jury,—the determination of that matter was confided entirely to the Chief Engineer, and the evidence was entirely irrelevant.

But, even if that question had been open, the fact that other contractors had done no better than McGuckin,

Shower & Co., could be no evidence that they had done well. Such a test would be no more safe in the domain of fact than in that of morals.

The next exception was taken to the refusal of the Court to allow the plaintiffs to prove that, after the annulment of the contract, and after the Company had advertised for proposals, Geiger and others called upon the officers of the appellee, and offered to do the work at the former prices, and to give security.

There is no theory of the case upon which such evidence could have been admissible. The annulment of the contract left the Company entirely free to contract anew, and the officers of the Company pursued the usual and proper course in advertising for bids, and accepting the lowest offers from parties supposed to be responsible. The result was, that more than the retained per centage and unpaid money was absorbed, but such a result does not even prove that the judgment of the officers was misled.

The evidence was not admissible as affecting the damages, because, the retained per centage was in the hands of the appellee, strictly as liquidated damages.

The third exception was to the action of the Court with respect to the prayers. The plaintiffs presented eight prayers, all of which were rejected, and the defendant two, which were granted.

The contract between the parties made the Chief Engineer the arbiter between them, and committed to him solely the authority to determine whether the work was progressing with sufficient speed; and his determination was conclusive, and in this controversy must be treated as correct. 1 *Redfield on Railways*, 416; *Peirce on Railways*, 377-9, 381-2; *Faunce vs. Burke*, 16 *Penna. St. Rep.*, 479-480; *Ranger vs. Great W. R. R. Co.*, 5 *Ho. Lords Cases*, 106-110; *Herrick vs. Belknap*, 28 *Vermont*, 679, 684-5; *Kidwell vs. B. & O. R. R. Co.*, 11 *Grattan*, 690; *Scott vs. Corporation of Liverpool*, 5 *Jur. N. S.*,

108, &c.; *Hennessey vs. Farrell,* 4 *Cushing,* 267; 5*th and* 8*th Ins. of Judge Taney in Howard vs. Phil. &c. R. R. Co.,* 1 *Amer. R. W. Cases,* 88.

The determination is in the nature of an award, and could be relieved against, even in equity, only for fraud, partiality, or *obvious* mistake. 1 *Redfield on Railways,* 416; *Scott vs. Corporation of Liverpool,* 31 *Law Times,* 147.

The annulment of the contract produced the consequences that the agreements of the appellee, and *all claims* based upon them, should at once become null and void, and that the unpaid part of the value of the work done, should be forfeited to the use of the appellee, *in the nature of liquidated damages.* The fund is what the contract calls it—*liquidated damages. Faunce vs. Burke,* 16 *Penna. St.,* 482-4; *Ranger vs. Great W. R. R. Co.,* 5 *Ho. Lords Cases,* 94, 95, 104, 108, 119; *Howard vs. Phil. &c. R. R. Co.,* 1 *Amer. R. W. Cases,* 102, 103, 104, 106-7, *and note at bottom of page* 107; 2 *Parsons on Contracts, sec.* 2, *chapter* 7.

The prayers granted, asserted these principles, and those rejected were inconsistent with them.

ROBINSON, J., delivered the opinion of the Court.

This suit was brought by the appellants as assignees in bankruptcy, to recover damages of the appellee, for breaches on two contracts for the construction of the appellee's railroad, and to recover in addition thereto for work done under the contracts.

The contracts were executed July 28, 1870, one for the construction of the lower or Owings' Mill division, and the other for the upper or Williamsport division, and provided that the contractors were to begin the work within thirty days after notice, and complete the same within eight months.

They also provided that the work was to be done under the direction of the engineer of the appellee, who was to

Geiger, *et al.* *vs.* The Western Maryland R. R. Co.

make monthly estimates of the quantity, character and value of the work done, and 85 per cent. of the value of the work estimated for, was to be paid to the contractors, the remaining 15 per centum being retained; and when the work should be completed and accepted by the engineer, a final estimate of all the work was to be made, and the balance appearing to be due the contractors, including the per centage so retained, was to be paid to the contractors.

If the contractors should refuse or neglect to prosecute the work with a sufficient force in the judgment of the engineer to complete the work within the time specified in the contract, the engineer was authorized to employ such number of men as would in his judgment be sufficient to insure its completion within the time prescribed, and to charge the wages as so much paid to the contractors under their contract.

The contracts then further provided, that if the contractors should not from time to time comply with the stipulations on their part, in manner and form, and within the time stipulated; *or* in case it should appear to the chief engineer that the work did not progress with sufficient speed; *or* in case of interference with the work by legal proceedings, instituted against the contractors by any one, other than the Company itself, the said chief engineer might annul the contract by notice in writing to the contractors, and that upon the service of such notice the "foregoing agreements on the part of the Company, and every claim and part thereof, shall become null and void, and the unpaid part of the value of the work done shall be forfeited by the said parties of the first part to the use of said Company in the nature of liquidated damages;" and that all right of occupancy on the part of the contractors, and all their rights in and to any further prosecution or interest in the work should cease, and that the Company might contract anew as though the contract in controversy had never been made.

The work on the Owings' Mill division was begun in June, 1871, nearly ten months after the execution of the contract, but owing to the difficulty in securing the right of way, and the financial embarrassments of the appellee, it was in a measure suspended, and was not actively resumed again until April, 1872.

On the Williamsport division it was begun in October, 1871, but was stopped by formal notice in December following, and resumed again in April, 1872.

The work on the Owings' Mill division not having progressed with that speed which the engineer thought it ought to do, and the contractors having failed, after due notice, to remove monthly the quantity of earth required, the engineer, on the 12th September, 1872, annulled the contract, and the work on the lower division having been abandoned, the contract was annulled the January following.

The main questions presented by this appeal are—

*First.*—The right of the engineer to annul the contracts.

*Secondly.*—Whether the forfeiture of the unpaid value of the work done is to be considered *as a penalty* to indemnify the appellee for breaches of the contracts, *or* as a *fixed sum* for compensation, in the nature of *liquidated damages?*

*Thirdly.*—If liquidated damages, whether it includes, in addition to the 15 per centum retained by the appellee, an amount due and unpaid on the monthly estimates?

*Fourthly.*—The claim of the contractors for damages on account of breaches by the appellee.

*First.*—It is by no means unusual to find in contracts for railroad construction, provisions not only referring to the sole and absolute determination of the Company's engineer, the monthly estimates as to the quantity, character and value of the work done, but also provisions conferring upon him the power to annul at any time the contract, if the work should not progress with that speed

which he in the exercise of his judgment might think proper. However stringent and arbitrary such provisions may seem at first sight, when we consider the character and magnitude of works of this kind, and the vital importance of having the construction completed within a given time, often prescribed by their charters, we can understand the necessity of guarding against breaches on the part of the contractors by covenants of the strictest and most imperative character. Be this however as it may, it is well settled that when such power is conferred by the contract on the engineer, the exercise of it by him, in the absence of proof of bad faith, is binding upon the parties. In this case, there is not a particle of proof to show that it was improperly exercised by the engineer of the appellee. On the contrary, it shows that he exercised it with the greatest reluctance. The work was actively resumed by the contractors in April, 1872, and so early as May 11th, we find him urging them by letter to increase their force so as to enable them to remove 4,000 cubic yards per month. On July 10th he writes again, saying that they had removed but 2,500 yards during the preceding month, and warns them that unless their force is increased, he will be compelled to annul the contract. Other notices, both verbal and written, were given, but finding them of no avail, the contract for the Owings' Mill division was, on the 12th September, 1872, annulled.

The work on the Williamsport division was abandoned by the contractors in September, 1872, and in January following this contract was also annulled.

There is no proof to show that the contractors were hindered or in any manner delayed in the progress of the work, by the Company, after it was resumed in April, 1872. It is true the East End of the deep cut on the Grafflin and Patterson property was not opened, but the engineer says due allowance was made for this, in the requirement, that 4,000 cubic yards of earth should be removed per month.

Whatever may have been the delay in the progress of the work in 1871, resulting from the failure of the appellee to acquire the right of way, or whatever inconvenience and loss the contractors may have sustained by the non-payment of the monthly estimates, these facts in no manner affected or impaired the right of the engineer to annul the contract for the failure to prosecute the work with proper speed after it was begun in April, 1872. Owing to the financial embarrassments of the appellee, the work was in a measure suspended in the latter part of 1871, and when by the aid of the city's subscription, it was enabled to resume the construction in 1872, the work was to be prosecuted according to the terms of the contract. By these terms, the engineer was expressly empowered to annul the contract, and his right to do so under the circumstances of this case, is too clear for controversy.

*Secondly*.—Conceding then, that the power to annul the contract was lawfully exercised, this brings us to the question as to whether the forfeiture prescribed therein is to be considered in the nature of a *penalty to cover damages* for breaches on the part of the contractors, *or*, as a sum agreed upon to be forfeited by the contractors and fixed as compensation for *damages* which the appellee might sustain. As a general rule it is true, that where a sum of money is stipulated to be paid for the non-performance of a contract, Courts are inclined to treat the sum thus to be paid, *as a penalty* to cover damages arising from the breach, and not as a sum of money really intended to be paid. But it is certainly open to parties who are about to make a contract, to stipulate that on failure to perform what has been agreed to be done, a fixed sum shall be paid by way of compensation. Whether a sum so fixed is to be considered as merely in the nature of a security for the actual amount of damage incurred, or as an agreed amount of *liquidated damages*, is often a question difficult to determine. We shall not attempt to review the many reported

cases on this subject, but content ourselves by stating what we understand to be the general rules governing Courts in the determination of this question. Where it is doubtful on the face of the instrument whether the sum was intended to be *stipulated damages*, or a *penalty* to cover actual damages; *or* where a *greater sum* is to be paid upon the failure to pay *a less; or* where the covenant is for the performance of a single act or several acts, and the damages sustained on account of the failure to perform which are of a *fixed and determinate character*, and such as are readily ascertainable by a jury, in such cases the sum to be paid by the party in default will be considered *as a penalty*. *Kemble vs. Farren*, 6 *Bing.*, 141; *Astley vs. Weldon*, 2 *B. & P.*, 346; *Horner vs. Flintoff*, 9 *M. & W.*, 678; *Taloc vs. Sandiford*, 7 *Wheat.*, 13; *Edwards vs. Williams*, 5 *Taunt.*, 247; *Atkyns vs. Kinnear*, 4 *Ex.*, 776. On the other hand, where the parties have declared in clear and unambiguous terms that a certain sum shall be paid by way of compensation, upon a breach of the contract, or where the covenant is to do several acts, the damages arising from the breach of which are uncertain, and incapable of being ascertained by any fixed pecuniary standard, and especially where the contract provides that the sum so named shall be paid as *liquidated damages*, the sum so fixed and agreed upon will be considered as compensation for damages resulting from the breach, and not as a penalty. *Ranger vs. Great Western Railway Company and others*, 5 *House of Lords Cases*, 72; *Beall vs. Hayes*, 5 *Sandford*, 640; *Bagley vs. Peddie, id.* 192. *Reilly vs. Jones*, 1 *Bing.*, 302; *Smith vs. Smith*, 4 *Wend.*, 489; *Knapp vs. Maelly*, 13 *Wend.*, 587; *Sainter vs. Ferguson*, 7 *C. B.*, 716; *Fletcher vs. Dyche*, 2 *T. R.*, 32; 1 *Am. Railway Cases, note, page* 107.

The contract before us was for the construction of the appellee's railroad, and upon the failure on the part of the contractors to perform their part of the contract, it was

expressly stipulated, that the value of the unpaid work should be forfeited as liquidated damages. In addition to this, it must be admitted that damages arising from the breaches upon which the forfeiture depended, namely, the failure to construct the road in the manner and by the time prescribed in the contract; *or* the failure to prosecute the work with such speed as the engineer might deem proper; *or* the interference with the work by legal proceedings instituted against the contractors by other parties than the appellee, were uncertain and not capable of being ascertained by any *fixed pecuniary standard*. Looking then to the character of the work to be done, and to the express terms of the contract itself, and the uncertain nature of the damages resulting from a breach of it by the contractors, we find nearly, if not all the circumstances which have been relied on in the different reported cases as distinguishing liquidated damages from penalties. We are of opinion, therefore, that the parties meant that the forfeiture should be a fixed sum as a compensation for damages, and not as a *penalty*.

*Thirdly.*—If so, the question arises as to what does the forfeiture include? At the time of the annulment of the contract the appellee had in hand the 15 per centum retained on the monthly estimates, and in addition thereto was indebted to the contractor a certain amount on account of the monthly estimates. The appellee's contention is that the forfeiture includes not only the 15 per centum so retained, but also all sums due and unpaid, on the monthly estimates. We find nothing in the contract to justify this construction. By the terms of the contract, 85 per cent. of the monthly estimates was to be paid to the contractors at the time when such estimates should be made by the engineer. It is very evident that both parties considered the punctual payment of this amount as necessary to enable the contractors to meet current expenses, and to prosecute successfully the work. The only amount to remain

in the hands of the appellee unpaid, was the 15 per centum which was retained to secure the faithful execution of the contract, and as indemnity in the event of a failure on the part of the contractors to prosecute the work. When, therefore, it was agreed that upon a breach of the contract, they should forfeit the unpaid part of the value of the work done, inasmuch as the 15 per centum was the only part intended by the parties to remain in the hands of the appellee unpaid, we must conclude they meant this sum and no other, to be included in the forfeiture.

*Fourthly.*—We find no grounds on which the claim for damages on account of breaches by the appellee can be sustained. It is true, the work was delayed in 1871 by the failure on the part of the appellee to secure the right of way, and further, that the appellee was unable to pay the monthly estimates according to the terms of the contract. It was in the power, however, of the appellee to annul the contract at any time on giving ten days' notice. This power the company did not exercise, but owing to its inability to meet current expenses, the work was in a great measure suspended in the latter part of 1871. The evidence shows, that both parties were looking to aid from the city by way of subscription to the appellee's stock, in order to enable the latter to prosecute the work.

The subscription was made and the amount due on the monthly estimates up to that time was paid, and in April, 1872, the construction was actively resumed. There was no claim then made for damages on account of any supposed breaches by the appellee. On the contrary, the proof shows that with full knowledge of its financial embarrassments, the contractors prepared to prosecute the work so far as it was then practicable, hoping and expecting aid from the city, whereby the company might be enabled to complete the construction of its road.

The evidence offered in the first and second bills of exception was clearly inadmissible. Under the first excep-

tion the appellants offered to prove that after the contract had been annulled the parties to whom the work was allotted on the Baltimore division did not proceed with more expedition than the contractors under whom the appellants claim. The question as to the proper progress of the work was by the express terms of the contract confided to the sole determination of the appellee's engineer, and in the absence of fraud or bad faith his decision was binding on the parties. The fact that subsequent contractors did not prosecute the work with more speed, did not tend to prove bad faith on the part of the engineer, nor that the appellants' contractors were progressing with the work in a manner to enable them to complete it within the time prescribed by the contract.

The second exception was taken to the refusal by the Court to allow the plaintiffs to prove that after the annulment of the contract, and after the company had advertized for proposals, the appellants called upon the officers of the appellee and offered to do the work at former prices, and to give security for the faithful execution of the same. There is no theory of the case upon which such evidence could have been admissible. By the annulment of the contract the company was left entirely free to contract anew, and was in no manner bound to accept the appellants' proposal.

From these views it follows that the 1st, 2d, 3d, 4th, 5th, 6th and 7th prayers of the appellants were properly refused; the first prayer being considered as part of the succeeding, and offered in that connection. There was error, however, in the refusal of the 8th prayer, and in granting the two prayers offered by the appellee.

*Judgment reversed, and*
*new trial awarded.*

(Decided 26th June, 1874.)